## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LIUTAURAS P. DARGIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 02 C 6872 |
| | ) |
| MICHAEL SHEAHAN, Sheriff of Cook | ) Judge Rebecca R. Pallmeyer |
| County a/k/a and d/b/a Cook County Sheriff's) | |
| Office of Corrections; MARCUS LYLES, | ) |
| Sheriff's Assistant Executive Director | ) |
| of the Cook County Sheriff's Office of | ) |
| Corrections; ERNESTO VELASCO, | ) |
| Executive Director of the Cook County | ) |
| Sheriff's Office of Corrections; | ) |
| the COUNTY OF COOK, a Political | ) |
| Subdivision of the State of Illinois; | ) |
| and JANE DOE and All Others Not | ) |
| Presently Known, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

From until 1982 until 2000, Plaintiff Liutauras Dargis was employed as a correctional officer with the Cook County Sheriff's Office. In 2000, he went on short-term disability leave after suffering a stroke while on duty. One year later, his physician cleared him to return to work with restrictions limiting his physical activity and prohibiting contact with inmates. The Sheriff's Office refused to allow Dargis to return to duty with these restrictions, and he has been on unpaid leave since then.

Plaintiff now brings suit against Cook County; Cook County Sheriff Michael Sheahan; Marcus Lyles, the Assistant Director of the Cook County Sheriff's Department of Corrections; and Ernesto Velasco, the Executive Director of the Cook County, claiming that Defendants' refusal to allow him to continue his employment violates the Americans with Disabilities Act, 42 U.S.C. § 1211 *et seq.* Plaintiff also proceeds on a number of additional federal and state law claims. Specifically, he alleges violation of his ADA and civil rights under 42 U.S.C. § 1983 (Counts II and III); conspiracy to violate his ADA and civil rights under 42 U.S.C. § 1985 (Count IV); violations of the

Illinois Human Rights Act, 775 ILCS 5/2-102 *et seq.* (Count V); a claim for imposition of liability for state claims under the doctrine of *respondeat superior* (Count VI); violation of the Illinois Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102 (Count VII); violation of the Due Process Clause of the Illinois Constitution (Count VIII); wrongful constructive discharge (Count IX); breach of the collective bargaining agreement (Count X); violation of Cook County Human Rights Ordinance, No. 93-0-13 (Count XI); and conspiracy to violate the Illinois Human Rights Act and Cook County Human Rights Ordinance (Count XII). Defendants seek summary judgment. For the reasons set forth below, the motion is granted in part and denied in part. The court orders Defendants to provide such process as is due a terminated correctional officer under state law. All other state law claims are dismissed without prejudice to litigation of those claims in state court.

## FACTUAL BACKGROUND

Plaintiff began working for the Cook County Sheriff's Office in May 1982, when he was hired as a correctional officer. (Defendants' Local Rule 56.1(a) Statement, hereinafter, "Defs.' 56.1(a)," ¶ 8.) As a correctional officer, Plaintiff was assigned to the inmate pretrial detainee division, where he supervised pretrial detainees for the Cook County Sheriff's Department of Corrections (the "Department of Corrections"). (Defs.' 56.1(a) ¶ 18; Dargis Affidavit, Plaintiff's Ex. 1, ¶ 5.) On February 9, 2001, while working as a day shift sergeant,[1] Plaintiff suffered a stroke and was placed on short-term disability leave. (*Id.* ¶ 9.) During his recovery, Plaintiff contacted John Maul, an Assistant Executive Director of the Cook County Sheriff Office's Department of Corrections, regarding his possible return to duty.[2] (Dargis Affidavit, Plaintiff's Ex. 1, ¶ 8.) According to Plaintiff, Maul assured him that, upon his recovery, he would be able to return to work and would be

---

[1]      The record does not reflect whether Plaintiff's assignment as a "day shift sergeant" represented a promotion from his original position at the Department of Corrections, nor when he had been assigned to this duty.

[2]      The record does not reflect the date of Plaintiff's meeting with Maul.

2

reassigned to a position without inmate contact. (*Id.*)

On July 2, 2001, Plaintiff sought to return to work for the Department of Corrections.[3] (*Id.* ¶ 10.) Upon his return, he presented a note from his personal physician, Dr. Margaret Wade, to Marcus Lyles. (*Id.* ¶ 11; Ex. 9.) Dr. Wade's note reported that Plaintiff suffered from a number of medical problems, "including Type 1 Diabetes, Coronary Artery Disease, Chronic Myofacial Pain Syndrome, Bilateral Retinopathy Vitreous Hemorrhages, and Peripheral Vascular Disease." (Defs.' 56.1(a) ¶ 12; Ex. 9.) In light of these conditions, Dr. Wade stated that Plaintiff could work only under certain limitations. Specifically, the note explained that Plaintiff was unable to "lift, kneel, stoop, or run," and that he could engage in no physical activities beyond "sitting in a chair and episodes of brief standing and brief walking." (Ex. 9 to Defs.' 56.1(a).) Additionally, Plaintiff advised Lyles that he could not have any contact with the general inmate population because a blow to his head could result in blindness or other serious medical complications. (Defs.' 56.1(a) ¶ 14; Dargis Affidavit, Plaintiff's Ex. 1, ¶ 12.) Executive Director Lyles refused to return Plaintiff to duty under these restrictions. (Defs.' 56.1(a) ¶ 15.) According to Defendants, the remaining individual Defendants, Cook County Sheriff Michael Sheahan and Ernesto Velasco, the Executive Director of the Cook County Sheriff's Department of Corrections, played no direct role in the decision not to return Plaintiff to active duty. It is undisputed that at no point did Plaintiff discuss his medical conditions or desire to return to work with either Defendant Sheahan or Defendant Velasco. (Defs.' 56.1(a) ¶¶ 28-30.)

The County's job description provides that correctional officers "observe and supervise the behavior of inmates . . . [e]nforce rules and regulations established for the maintenance of order, discipline, and safety . . . and communicate with inmates to ascertain attitudes, problems and rehabilitation." (Ex. 25 to Plaintiff's Brief.) The description also lists typical duties, specifying that

---

[3]     In their 56.1(a) statement, Defendants state that Plaintiff attempted to return to work in July 2002; the court concludes from the record that this was a typographical error.

3

a correctional officer: (1) "[m]akes rounds of assigned area to inspect conditions, the activity of inmates and to check for any unusual happenings"; (2) "[g]uards access and egress through gates leading to the receiving room, hospital, visitor area, vocational counseling rooms and main entrance to the jail"; (3) "[i]nspects all vehicles entering or leaving the correctional institution . . . checks all visitors to determine presence of contraband items"; (4) "[s]upervises and checks the work of inmates engaged in maintenance, custodial, laundry, tailoring and clerical tasks"; (5) "[p]erforms guard duties in receiving room through which pass all prisoners received from local and federal police authority . . . and [k]eeps an orderly and regulated flow of inmates into the institution." (Cook County Correctional Officer Job Description, Ex. 25 to Plaintiff's Brief.)

Within the Department of Corrections, correctional officers are posted at a variety of assignments presenting more or less inmate contact. Plaintiff's assignment as a correctional sergeant required continual inmate contact. (Id. ¶ 18.) Defendants assert that all sworn correctional officers are required to have some contact with the general inmate population as a part of their job duties and that, although some correctional officer assignments involve little inmate contact, there are no assignments that require absolutely no inmate contact. (Id. ¶¶ 16, 17.) Instead, as explained in Marcus Lyle's affidavit, all Department of Corrections officers, regardless of their assignment, must be "ready and able" to respond to emergencies, such as a riot, fight, or escape, and to fill in for other officers when necessary. (Id. ¶¶ 17, 19; Lyles Affidavit, Ex. 1 to Defendants' Ex. 1, ¶ 15.)

Plaintiff admits that his current medical restrictions preclude him from performing any duties requiring inmate contact, including in emergency situations. (Id. ¶ 21.) Nevertheless, Plaintiff asserts that there are some assignments within the Department of Corrections that do not require inmate contact at any time.[4] Prior to this lawsuit, Plaintiff requested assignment to the records

---

[4]     Plaintiff lists a number of assignments within the Department of Corrections in which
(continued...)

4

office, the training academy, the firing range, or the computer room as an accommodation in light of his medical restrictions.[5] (Defs.' 56.1(a) ¶ 20.) The Collective Bargaining Agreement covering Cook County correctional officers contains a bidding system allowing employees to "bid" on various job assignments, such as training academy and gun range instruction. Under this system, vacancies are posted for seven days, during which interested employees may submit written bids. After the posting period, the assignment is "filled by the most senior employee who bids thereon, provided said employee had [sic] the ability to perform the job and said employee meets all qualification standards required by the unit." (Collective Bargaining Agreement, Ex. 27 to Plaintiff's Brief, hereinafter CBA, at 9-10.) The court is uncertain whether Plaintiff submitted a formal bid for the assignments he desires, but it is undisputed that Defendants denied Plaintiff's request on the grounds that he is unable to respond to emergencies or come into contact with inmates. (*Id.* ¶ 21.) Defendants maintain that these are essential job functions, and Plaintiff himself admitted during his deposition that correctional officers are generally "responsible for breaking up fights that occur between members of the inmate population" and responding to emergencies such as riots or escapes. (*Id*; Dargis Deposition, Defendant's Ex. 10, at 48-50.) Although Plaintiff maintained that officers posted in certain assignments would not be called upon to do so, he did not explain the basis for this belief. (*Id.*)

---

[4](...continued)
he claims correctional officers have no inmate contact. The Department of Corrections correctional officer assignment descriptions include: (1) "Tower Officer" (responsible for observing the physical perimeter of the prison; (2) "Rear Sallyport" (in charge of inspecting all vehicles entering and leaving the facility); (3) "Master Control" (works inside of a secure control room within prison); (4) "Roster Management" (works for Superintendent in secretarial role); (5) "Visiting/area officer" (escorts visitors to inmate meeting rooms); and (6) "Lobby" (assists members of the general public); (7) "Records Department" (staffed by civilians as well as sworn correctional officers); (8) "Training Academy" (off site assignment); (9) "Computer Room"; and (10) "Gun Range Instructor" (off-site assignment). (Dargis Affidavit, Plaintiff's Ex. 1, at 9-11.)

[5]     The record does not reflect to whom Plaintiff made this request, nor when it was made.

Plaintiff has not been subject to disciplinary charges and has not resigned. (*Id.* ¶¶ 24, 27.) To date, he remains on what both parties refer to as "zero-pay status" with the Sheriff's Office. (*Id.* ¶ 25.) According to Defendants, he remains employed with the Sheriff's Office. (*Id.* ¶ 27.) Plaintiff contends, however, that he has been effectively discharged by Defendants' refusal to accommodate or reassign him since he is neither being paid nor allowed to return to work. (Plaintiff's Response to Defs.' 56.1(a) ¶ 27.)

Plaintiff filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") on November 29, 2001. (Ex. 2 to Defs.' 56.1(a).) He filed his original complaint in this case on September 26, 2002 and an amended complaint on April 3, 2003. (Defs.' 56.1(a) ¶ 4; Ex. 3 to Defs.' 56.1(a).) In his amended complaint, Plaintiff claims that Defendants' refusal to make a reasonable accommodation to his disability constitutes a violation of the Americans with Disabilities Act, 42 U.S.C. § 1211 *et seq.* In addition, as noted earlier, Plaintiff has asserted conspiracy claims under federal law and a host of state law claims. Defendants now move for summary judgment.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## I.    ADA Claim

The Americans with Disabilities Act (the "ADA") prohibits workplace discrimination against

6

any "qualified individual with a disability." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must establish that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to "perform the essential functions of the job with or without reasonable accommodation"; and (3) the employer has taken an adverse employment action as a result of the disability or has failed to make a reasonable accommodation to the plaintiff's disability. *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (citations omitted); *see also Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002), *citing Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669-70 (7th Cir. 2000). Defendants contend that Plaintiff has failed to meet this second prong by failing to present evidence that he is a qualified individual under the ADA.[6]

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998). In order to show that he is a qualified individual under the ADA, Plaintiff must establish (1) that he possesses "the skill, experience, education and other job related requirements" of the position and (2) that, with or without reasonable accommodation, he will be able to "perform the essential functions" of the position. *Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1068 (N.D. III. 2001), *citing Ross*, 159 F.3d at 1013.

---

[6]     In their original summary judgment brief, Defendants did not dispute that Plaintiff had presented sufficient evidence concerning the first and the third prongs. (Memorandum in Support of Defendants' Motion for Summary Judgment, hereinafter Defendants' Brief, at 4.) In their reply brief, however, Defendants dispute Plaintiff's contention that they conceded his ability to make these first and third showings. (Defendants' Reply to Plaintiff's Amended Response to Defendants' Motion for Summary Judgment, hereinafter Defendants' Reply Brief, at 7.) Having conceded the issue in its opening brief, however, Defendants cannot argue the issue in their reply brief. *See Griffin v. Summerlin*, 78 F.3d 1227, 1231 (7th Cir. 1996) (argument raised for first time in reply brief is waived).

In light of Plaintiff's eighteen-year service, the court can assume that he possesses the requisite skill, experience, education and other job-related requirements for the position of correctional officer. Plaintiff claims, further, that the evidence establishes that he was capable of performing a number of the duties performed by correctional officers within the Department of Corrections despite his medical restrictions. The only accommodations necessary, which Plaintiff contends are reasonable, are that he not have any inmate contact and that his physical activity be limited to sitting in a chair, with brief periods of standing and walking. In contrast, Defendant maintains that Plaintiff can no longer "perform the essential functions" required of Department of Corrections employees, either with or without accommodation. Defendants have identified a long list of duties that correctional officers are required to perform and that Plaintiff concedes he cannot perform due to his infirmities. Although Plaintiff contends that there are a number of assignments within the Department of Corrections for which he is eligible despite his disability, Defendants insist that correctional officers rotate through various duty assignments "as necessary or appropriate"[7] and that all officers are expected and required to be able to perform all of these basic duties. (Lyles Affidavit, Defendants' Ex. 1 ¶ 6.) In addition, Defendants maintain that contact with the general inmate population is an essential function of every position with the Department of Corrections, and that there are no correctional officer assignments that can guarantee no inmate contact.

Generally, an employer is allowed to determine the responsibilities and qualifications of a given position, and courts will not "second-guess that judgment so long as the employer's reasons

---

[7]     Defendants refer to this rotation requirement as though the Department has an official and express policy requiring correctional officers to rotate through assignments on a regular basis. Although Plaintiff admits that he has served in a number of assignments during his tenure with the Department of Corrections, (Dargis Deposition, at 8, 29-30), the court has found no express provisions in either the correctional officer job description or collective bargaining agreement providing for a regular rotation policy among correctional officers. As discussed below, however, these documents do provide that correctional officers may be temporarily posted to other assignments.

are not pretextual." *Basith v. Cook County*, 241 F.3d 919, 920 (7th Cir. 2001), *citing DePaoli v. Abbott Laborotories*, 140 F.3d 668, 674 (7th Cir. 1998). Among the factors considered when determining whether a job duty constitutes an essential function are the "job description, employer's opinion, amount of time spent performing the function, consequences for not requiring the individual to perform the duty, and past and current work experiences." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 512-13 (7th Cir. 2001), *citing Basith*, 241 F.3d at 927.

In this case, the County's job description specifies that correctional officers "observe and supervise the behavior of inmates, . . . [e]nforce rules and regulations established for the maintenance of order, discipline, and safety . . . and communicate with inmates to ascertain attitudes, problems and rehabilitation." (Ex. 25 to Plaintiff's Brief.) The description also lists typical duties, as discussed above, most of which involve inmate contact. (*Id.*) The job description includes a disclaimer that these above-mentioned duties "are not to be construed as a complete list of the many duties normally to be performed under a job title or those to be performed temporarily outside an employee's normal line of work." (*Id.*) The collective bargaining agreement ("CBA") similarly states that the Department of Corrections "may temporarily assign employees regardless of seniority" for up to sixty days. (CBA, at 10.) In addition, Plaintiff himself admitted in his deposition that, as a correctional officer, he had been assigned to a wide variety of duties and had often been temporarily assigned to various posts as a substitute, and that he had been responsible for responding to emergencies within the jail. (Dargis Deposition, at 30, 82.)

Nevertheless, Plaintiff insists that the Department of Corrections' requirement that officers be able to respond to emergencies are not absolute job requirements. He claims that deputy correctional officers "rarely, if ever, are required physically to restrain inmates." (Plaintiff's Amended Memorandum of Law in Opposition to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, hereinafter "Plaintiff's Mem.", at 7.) Moreover, Plaintiff

9

notes that a number of assignments within the Department of Corrections do not explicitly require contact with the general inmate population. (Plaintiff's Ex. 25.)

In *Miller v. Illinois Dep't of Corrections*, 107 F.3d 483 (7th Cir. 1997), the Seventh Circuit considered the essential duties of a correctional officer employed within the state prison system. The plaintiff in that case could not perform many of the long list of duties that correctional officers were required to perform due to a disability. *Id.* at 485. As Dargis does here, the plaintiff argued that she was entitled to a reasonable accommodation, in which she would be reassigned to a suitable assignment and would not be required to rotate through various duty assignments, as correctional officers were required to do. *Id.* The court rejected this proposal, stating:

> [I]f an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its *essential* duties.

*Id.* The court also discussed approvingly the rationale for requiring assignment rotation "[i]n the case of correctional officers and other paramilitary and military personnel," noting that such rotation is necessary in order to "respond to unexpected surges in demand for particular abilities" so that the prison is, for example, "able to call upon its full staff of correctional offices for help in putting down a prison riot. . . ."[8] *Id.* The court concluded, "[i]t would not do to have a correctional officer whose only experience and capability were in operating a telephone switchboard or issuing weapons."[9] *Id.*

---

[8]     As noted earlier, it is not clear whether Defendants contend that all correctional officers are required, as in the *Miller* case, to rotate through all assignments on a regular basis. Defendants do assert that, as codified in the job description, all correctional officers, regardless of their current assignment, may be called upon to respond to emergency situations. (Plaintiff's Ex. 25.)

[9]     The *Miller* court allowed that plaintiff might be entitled to assignment to a non-correctional officer position within the Department of Corrections as a reasonable accommodation to her disability. *Miller*, 107 F.3d at 485-86. The court pointed to a number of service positions, (continued...)

10

That correctional officers are "rarely, if ever" required to physically restrain inmates does not alter the analysis. (Plaintiff's Brief, at 7.) Although the amount of time spent on a particular task may be considered when determining whether the task is "essential," an essential function "need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential." *Basith*, 241 F.3d at 929 (citations omitted); *see also Doner v. City of Rockford*, 77 Fed. Appx. 898, 2003 WL 22345473 (7th Cir. 2003) (concluding that the apprehension of suspects is an essential, if infrequent, function of serving as a police investigator); *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) (The fact "that not all employees perform at a particular time all the essential job functions does not make those functions non-essential."). Fortunately, correctional officers are not often called upon to respond to a riot or escape; nevertheless, the fact that such crises occur infrequently does not make the ability to respond to them any less essential.

Other Circuits that have examined this issue have reached similar conclusions. In *Kees v. Wallenstein*, 161 F.3d 1196 (9th Cir. 1998), for example, the Ninth Circuit upheld a district court's grant of summary judgment against several correctional officers who sued under the ADA, challenging their employer's characterization of the ability to handle inmate contact as an essential function even for correctional officers assigned to "light duty" in the jail's control room. The court held that although the light duty assignments did not generally involve regular inmate contact, "their ability to restrain inmates during an emergency is critical to jail security." *Id.* at 1199. Similarly, in *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 727 (6th Cir. 2000), the Sixth Circuit held

---

[9](...continued)
such as cooks, dietitians, and receptionists, within the department that may not include the same responsibilities and requirements as correctional officer positions. *Id.* at 485. The court noted that the plaintiff had not applied for such a position, and held that "[u]ntil she applies for such a job, a suit complaining about the prison's refusal to give it to her is premature." *Id.* at 486. In this case, as far as the court can tell, Plaintiff has not requested appointment to any position other than correctional officer, nor has Plaintiff presented evidence that any such positions exist. Plaintiff has requested certain *assignments* in which he would have little or no inmate contact, but all of these assignments are held by correctional officers, who, as discussed, must be ready and able to respond to an emergency.

11

in an ADA case that "[a]lthough a [correctional officer] may be required physically to restrain inmates only infrequently, the potential for physical confrontation with inmates exists on a daily basis, and the consequence of failing to require a deputy to perform this function when the occasion arises could be a serious threat to security." The Eighth Circuit, in *Allison v. Dep't of Corrections*, 94 F.3d 494, 497-98 (8th Cir. 1996), similarly held in an ADA case that prison officials acted reasonably, and thus were entitled to qualified immunity, in dismissing an employee who had permanent medical restrictions from involvement with inmate contact or conflict situations.

Plaintiff now requests reassignment to one of two off-site facilities at which, Plaintiff contends, correctional officers have no inmate contact.[10] In light of this case law, however, Plaintiff cannot maintain that inmate contact and the ability to respond to prison emergencies are not essential functions of all correctional officer assignments. Nor has Plaintiff demonstrated that the desired assignments are currently available. Under the ADA, an employer may be required "to reassign a disabled employee to a different position as [a] reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996). Although an employer may be obligated to reassign an employee, this obligation extends only to vacant positions/assignments. An employer is not obligated "to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee." *Id.* at 499, *citing Fedro v. Reno*, 21 F.3d 1391, 1396 (7th Cir. 1994).

In invoking an employer's duty to reassign, the employee-plaintiff bears the burden of demonstrating that a vacant position exists for which he is qualified. *Ozlowski v. Henderson*, 237

---

[10]     As discussed above, prior to this lawsuit, Plaintiff requested assignment to the records office, the training academy, the firing range, or the computer room as an accommodation in light of his medical restrictions, though the record does not reflect when or to whom he made this request. (Defs.' 56.1(a) ¶ 20.) At his meeting with Assistant Executive Direct Lyles, Plaintiff requested that he be reassigned in light of his disabilities, but there is no indication that he requested any particular assignment. (Dargis Affidavit, Plaintiff's Ex. 1, ¶ 12.)

F.3d 837, 840 (7th Cir. 2001) (citations omitted). Moreover, a position/assignment is not considered vacant if the employer has a "legitimate reason, unrelated to the employee's disability, for reserving the position for others." Winfrey, 259 F.3d at 618, citing Ozlowski, 237 F.3d at 841-42. As discussed above, the Collective Bargaining Agreement covering Cook County correctional officers establishes a bidding system allowing officers to "bid" on various job assignments, such as training academy and gun range. Under this system, open assignments are filled by the qualified bidder with the most seniority. (CBA, at 9-10.) Plaintiff has not shown that any such vacancies exist and, as noted above, the ADA does not require the Department of Corrections to "bump" others or, as discussed earlier, create a new assignment or position to accommodate Plaintiff. In any event, in light of his inability to have any contact with inmates, even in the event of a prison emergency, Plaintiff is not a "qualified individual with a disability" for purposes of ADA protection.

Plaintiff claims that the Department of Corrections has accommodated other correctional officers whose disabilities, like his own, precluded inmate contact. He has not, however, presented any evidence of such accommodations beyond his own affidavit and deposition testimony. Plaintiff states, for example, that he "believe[s]" that Officer Siejka and Sergeant Jones have both been permitted to return to work after suffering strokes that preclude them from having any contact with inmates, (Dargis Affidavit, Ex. 1 to Plaintiff's Brief, at 11), but he offers no evidentiary support for these "beliefs." Such "conclusory allegations and self-serving affidavits, unsupported by the record, will not preclude summary judgment." Basith, 241 F.3d at 928, citing Haywood v. North Am. Van Lines, Inc., 121 F.3d 1066, 1071 (7th Cir. 1997). Nor would the more favorable treatment of other officers who suffer from disabilities necessarily support Plaintiff's own failure-to-accommodate claim.

13

Defendants are entitled to summary judgment on Plaintiff's ADA claims.[11]

## II. § 1983 Claims

In addition to his ADA claim, Plaintiff brings § 1983 claims alleging that Defendants' discriminatory conduct resulted in his wrongful constructive discharge in violation of the Civil Rights Act of 1964 and the Due Process Clause of the U.S. Constitution. (Counts II and III.) Specifically, Plaintiff alleges that Defendants (1) refused to engage in good faith dialogue with Plaintiff regarding his disability and possible accommodations and (2) terminated his employment without a hearing.

### A. Interactive Process

As part of the reasonable accommodation duty, the ADA requires employers to engage in an interactive process with disabled employees seeking accommodation "so that together they can

---

[11] Defendants argue that summary judgment is proper on the alternative ground that Plaintiff is currently receiving Social Security disability payments based on his total inability to work. Defendants insist that the representations Plaintiff made to the Social Security Administration are inconsistent with those he now makes in pursuing a claim under the ADA. Generally, the Social Security Act is intended to "provide an income to disabled persons who cannot work" while the "ADA protects the employment rights of those who can." *Lee v. City of Salem*, 259 F.3d 667, 672 (7th Cir. 2001). In order to qualify for disability benefits, "an individual must show both that he is 'unable to do his previous work' and that he 'cannot . . . engage in any other kind of substantial gainful work which exists in the national economy . . .'" *Id.*, *citing* 42 U.S.C. § 423(d)(2)(A). In contrast, to establish a prima facie case of discrimination under the ADA one must show that, notwithstanding his disability, he can "perform the essential functions of his job with or without reasonable accommodation." *Id.* at 673, *citing* 42 U.S.C. § 12111(8). The Supreme Court has held that such claims are not necessarily mutually exclusive. *Cleveland v. Policy Mgmnt. Sys. Corp.*, 526 U.S. 795, 803 (1999). Nevertheless, an ADA plaintiff who has obtained Social Security disability benefits "must confront and reconcile the apparent inconsistency between that assertion and his ADA claim . . . ." *Lee*, 259 F.3d at 674.

Plaintiff asserts here that the representations he made to the Social Security Administration were the same as those he made to his physician and to the Department of Corrections. (Plaintiff's Brief, at 14-15.) He maintains that he applied for disability benefits "out of his and his family's dire necessity based on Defendants' refusal to all[ow] him to return to work." (*Id.* at 15.) He does not suggest that his statements to the Social Security Administration are inaccurate, however, nor does he contend that he is in fact capable of performing all the duties of a correctional officer with or without an accommodation. Having already concluded that summary judgment is proper for the reasons discussed above, the court need not consider the sufficiency of this response.

identify the employee's needs and discuss accommodation options." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001), *citing Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). The federal regulations implementing the ADA state that "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with a qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The regulations further require the employer to "make a reasonable effort to determine the appropriate accommodation . . . through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, App.; *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Plaintiff claims that Defendants failed to satisfy their obligation to engage initiate an interactive process. There is some confusion, however, regarding the federal statute underlying the § 1983 claims. The complaint itself purports to invoke the Civil Rights Act of 1964. (Count II.) But in his reply brief, Plaintiff discusses the claims as though they arise out of Defendants' failure to engage in the interactive process required under the ADA. For purposes of this motion, the court will presume that Plaintiff invokes § 1983 in an attempt to vindicate his rights under the ADA. *See Maine v. Thiboutot*, 448 U.S. 1 (1980) (Section 1983 suit may be brought based on violation of Constitution and federal statutes by state actors).

Plaintiff brings interactive process claims a gainst both the municipal and individual Defendants. The presence of the individual claims may explain why Plaintiff brings his "interactive process" claims under § 1983, rather than the ADA itself. The ADA forbids discrimination by any "covered entity," which is defined as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12112(a); 12111(2). The statute defines "employer" as "person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person . . . ." 42 U.S.C. § 12111(5)(A). In light of this language, the Seventh Circuit

has held that "individuals who do not otherwise meet the statutory definition of 'employer' cannot be held liable under the ADA." *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995). The court held that the "and any agent" language did not impose liability against individuals, but rather merely existed "to ensure that courts would impose *respondeat superior* liability upon employers for the acts of their agents." *Id.* at 1281, *citing Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

Plaintiff's assertion of an interactive process claim under § 1983, rather than the ADA, appears to be an effort to get around this hurdle. In the court's view, this is improper. "Generally, where a federal statute includes its own comprehensive enforcement scheme, that scheme may not be bypassed by pleading an underlying violation of the statute and bringing suit directly under § 1983." *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 856 (7th Cir. 1985). At least two Circuit Courts of Appeals and a number of district courts have concluded that the ADA provides a comprehensive enforcement mechanism precluding a § 1983 claim. *See Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034, 1038 (8th Cir. 1998); *Davis v. Francis Howell School Dist.*, 104 F.3d 204, 206 (8th Cir. 1997); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997); *Kagan v. Nevada*, 35 F. Supp. 2d 771, 772-73 (D. Nev. 1999); *Coffey v. County of Hennepin*, 23 F. Supp. 2d 1081, 1089 (D. Minn. 1998); *Meara v. Bennett*, 27 F. Supp. 2d 288, 291-92 (D. Mass. 1998); *Houck v. City of Prairie Village*, 978 F. Supp. 1397, 1405 (D. Kan. 1997); *Holmes v. City of Chicago*, No. 94 C 4083, 1995 WL 270231, at *5 (N.D. Ill. May 5, 1995). *But see Ransom v. State of Arizona Bd. of Regents*, 983 F. Supp. 895, 903-04 (D. Ariz. 1997); *Independent Housing Servs. of San Francisco v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328, 1345 (N.D. Cal. 1993).

This court concurs with the majority view on this matter. Allowing a plaintiff to pursue ADA violations under the guise of § 1983 adds nothing to his substantive rights under the ADA, except to extend individual liability against the Defendants and to possibly circumvent the administrative

and procedural requirements of that statute. Here, Plaintiff faces no procedural obstacles to an ADA claim – he has exhausted his administrative remedies under the ADA by obtaining a right to sue letter from the EEOC – but his claims against the individual Defendants cannot stand under the statute. Given the broad scope and comprehensive provisions of the ADA, the court does not believe that Plaintiff should be permitted to style his ADA claim as a count under § 1983 merely to expose the Defendants to individual liability. To the extent that Defendants violated the provisions of the ADA, Plaintiff's recourse must be to that statute.

## B. Due Process Claim

Plaintiff also brings a § 1983 claim alleging that Defendants violated his procedural due process rights by constructively discharging him without a hearing. To maintain a procedural due process claim, a plaintiff must show that he suffered a deprivation of a cognizable property or liberty interest and that the deprivation occurred without due process. *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003), *citing Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Due process guarantees the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Defendants do not dispute that, as an employee of the Cook County Sheriff's office, Plaintiff had a liberty interest in continued employment. *See* 55 ILCS 5/3-7012 (deputy sheriffs entitled to notice and a hearing before removal, demotion, or suspension); *Ellis v. Sheahan*, No. 01 C 759, 2004 WL 2392055, *2 (N.D. Ill. Oct. 22, 2004) (recognizing correctional officer's property interest in continued employment under Illinois law); *Garrido v. Cook County Sheriff's Merit Bd.*, 349 Ill. App. 3d 68, 78, 811 N.E.2d 312, 319 (1st Dist. 2004) (deputy sheriff enjoyed property interest in continued employment) (citations omitted). Nor do Defendants challenge Plaintiff's ability to raise a procedural due process claim based on a constructive discharge. *See Lifton v. Board of Educ.*

17

of the City of Chicago, 290 F. Supp. 2d 940, 944 (N.D. Ill. 2003) ("Constructive discharge can constitute deprivation of a protected interest."), citing Parrett v. City of Connersville, 737 F.2d 690, 694 (7th Cir. 1984). Instead, Defendants argue that Plaintiff cannot show that the due process deprivation occurred pursuant to a municipal policy so as to establish municipal liability under Monell. To the extent Defendants suggest their defense to § 1983 liability defeats Plaintiff's right to a hearing, the court is unmoved. Plaintiff has also brought a due process claim under the Illinois state Constitution. (Count VIII.) In light of this corresponding state claim, Defendants cannot rely on Monell and other § 1983-specific law to avoid their due process obligations. See Lewis v. Chicago Housing Authority, No. 98 C 2165, 1998 WL 774133, *2 (N.D. Ill. Oct. 28, 1998) (finding the argument that a single due process deprivation did not constitute an injury of constitutional proportions "truly bizarre").

In the court's view, Plaintiff's circumstances trigger the right to a hearing. Under the relevant statute, "no full-time deputy sheriff . . . shall be removed, demoted or suspended except for cause, upon written charges filed with the [Merit] Board by the Sheriff and a hearing before the Board thereon upon not less than 10 days' notice . . . ." 55 ILCS 5/3-7012. Defendants do not dispute that deputy correctional officers are entitled to a hearing prior to termination. Instead, Defendants contend that Plaintiff has not been deprived of a property interest because he is still employed with the sheriff's office, albeit on "zero-pay status." The court disagrees.

Although he has not been formally discharged, Plaintiff's employment status has changed significantly since suffering a stroke. Since going on short-term disability in 2000, Plaintiff has not received any wages, and the Department of Corrections has refused to reassign him to active duty. In similar cases, courts have held that involuntary placement on unpaid status constitutes a deprivation of a protected property interest. See Ceko v. Martin, 753 F. Supp. 1418, 1423 (N.D. Ill. 1990) (placement of police dispatcher on involuntary unpaid medical leave constitutes

18

deprivation of protected property interest); *Bauschard v. Martin*, No. 91 C 7839, 1993 WL 79259,

*4 (N.D. Ill. Mar. 16, 1993) (placement police officer on involuntary unpaid medical leave constituted

deprivation of protected property interest despite fact that office had neither been fired nor

resigned). In the words of one court, "[t]he interest in continued employment would be hollow

indeed if it did not secure payment, the primary benefit of being employed." *Ceko*, 753 F. Supp.

at 1423; *Bauschard*, 1993 WL 79259, *4. As such, Defendants' placement of Plaintiff on "zero-pay

status" and refusal to return him to active duty constitutes a deprivation of a protected property

interest, despite the fact that Plaintiff technically remains an employee of the Department of

Corrections. In light of this deprivation, Plaintiff is entitled, under Illinois statute and Constitution,

to notice and a hearing.[12]

### III.   Conspiracy Claim

In Count IV, Plaintiff brings claims under §§ 1983 and 1985 alleging that Defendants

"conspired to refusal [sic] to reinstate and discharge [Plaintiff] from his employment on account of

his disability" and to violate the ADA. A plaintiff bringing a conspiracy claim under § 1983 must

show: (1) that the defendant conspired with others to deprive him or her of a constitutional right;

(2) an act in furtherance of the conspiracy; and (3) the actual deprivation of a constitutional right.

*Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999); *Goldschmidt v. Patchett*, 686 F.2d 582, 585

(7th Cir. 1982) ("Section 1983 does not, however, punish conspiracy; an actual denial of a civil right

is necessary before a cause of action arises."). In order to maintain a conspiracy claim under §

1985(3), a plaintiff must show: (1) a conspiracy; (2) with the purpose of depriving, either directly

or indirectly, any person or class of persons of the equal protection of the laws or of equal

privileges or immunities under the laws; (3) an action in furtherance of the conspiracy; and (4) an

---

[12]      The present court has not examined the merits of Defendants' placement on "zero-pay status" nor his possible remedies under state law. Nothing in this opinion should be construed as a comment on the potential outcome of Plaintiff's due process hearing.

injury to plaintiff's person or property or a deprivation of a federal right or privilege. *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985), *citing United Bhd. of Carpenters and Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983).

Defendants argue that Plaintiff has not set forth any evidence showing the existence of a conspiracy or a "meeting of the minds." They correctly note that the decision not to return Plaintiff to work was made by Assistant Director Lyles, and that Plaintiff has presented no evidence that Lyles discussed his decision with any of the other individual Defendants. Moreover, although Defendants fail to cite it, under the intracorporate conspiracy doctrine, "a conspiracy cannot exist solely between members of the same entity." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999), *citing Wright v. Illinois Dep't of Children and Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994). Thus, "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). The Seventh Circuit has applied this doctrine to officials working within a government agency as well as private corporations. *Wright*, 40 F.3d at 1508. Therefore, as public employees working within the same government agency, the individual Defendants cannot be held liable for conspiring to discriminate against Plaintiff based on his disabled status.[13]

---

[13]    The court notes, in addition, some doubt over whether disabled individuals constitute a class for purposes of § 1985(3). Section 1985, as well as § 1983, originated as part of the Civil Rights Act of 1871, also known as the Ku Klux Klan Act. The Act was "specifically aimed at state officials and members of the Ku Klux Klan (persons who go in disguise on the highway) who had been terrorizing blacks." *Peck v. United States*, 470 F. Supp. 1003, 1011 (S.D.N.Y. 1979). In light of this history, the Supreme Court has held that "[t]he language [in § 1985(3) requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474 (7th Cir. 1985).

In *D'Amato*, the Seventh Circuit held that being physically handicapped or disabled "is not a historically suspect class such as race, national origin, or sex," and thus that a § 1985(3) claim (continued...)

20

## IV.    State and Local Claims

Having disposed all of the federal law claims, grounds no longer exist for federal subject matter jurisdiction over Plaintiff's state and local law claims. In such circumstances, a district court "should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994). "Pendent jurisdiction is a power which the district court, in the exercise of its sound discretion, may choose to grant; it is not a plaintiff's right." *Landstrom v. Illinois Dep't of Children and Family Servs.*, 892 F.2d 670, 679 (7th Cir. 1990). A district court's refusal to exercise pendent jurisdiction is "'almost unreviewable,' especially when all federal claims have been dropped from the case before trial and only state law claims remain." *Spencer v. Illinois Community Action Assoc.*, 164 F. Supp. 2d 1056, 1065 (N.D. Ill. 2001), *quoting Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989). "At that point, respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Id.* In light of this discretion, the court dismisses Plaintiff's remaining state and local law claims without prejudice.

---

[13](...continued)
cannot be brought for discrimination on the basis of physical disability in the employment context. *D'Amato*, 760 F.2d at 1486-87 (holding that employee that had been terminated due to disability could not bring conspiracy claim under § 1985(3)). At least some courts have questioned whether the enactment of the ADA, which refers to the disabled as a "discrete insular minority . . . subject to a history of unequal treatment . . . based on characteristics that are beyond the control of such individuals," brings the disabled within the protection of § 1985(3). *See Roth v. Evangelical Health Systems Corp.*, No. 93 C 3233, 1994 WL 388248, *8 n.3 (N.D. Ill. 1994) (discussing the uncertainty). Still others appear to conclude that disabled persons may be protected. *See Lake v. Arnold*, 112 F.3d 682, 686 (3d Cir. 1997) (concluding that the "mentally retarded are, as a class, entitled to protection under § 1985(3)"); *Trautz v. Weisman*, 819 F. Supp. 282, 290-91 (S.D.N.Y. 1993) (holding that with passage of the ADA, § 1985(3) applies to discrimination on the basis of physical disability). Because Plaintiff has not established the existence of a conspiracy, this court need not weigh in on the issue.

## CONCLUSION

Defendants' motion for summary judgment (Doc. No. 26-1) is granted as to Counts I, II (ADA), III, and IV. Counts V, VI, VII, IX, X, XI, and XII are dismissed without prejudice. Defendants' motion for summary judgment is denied as to Counts II (due process) and VIII. With respect to those claims only, the court enters judgment in favor of Plaintiff and directs Defendants to conduct a hearing within 30 days regarding Plaintiff's employment status pursuant to 55 ILCS 5/3-7012. The court will retain jurisdiction only for the purpose of enforcing this order.

ENTER:

Dated: March 25, 2005

REBECCA R. PALLMEYER
United States District Judge